**Jill Kappus Shaw, Esq.**
SHAW LAW, P.L.L.C.
P.O. BOX 599
Cortaro, Arizona 85652
(520) 867-8198
SB #031968
jillshaw@jshawlaw.com

&

**Salam A. Tekbali, Esq.**
TEKBALI LAW P.L.L.C
325 W. Franklin St.
Tucson, AZ 85701
(520) 624-8663
SB #035035
salamtekbali@gmail.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# IN THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Nidia Chavez,**<br>        Plaintiff,<br>vs.<br>**Southwest Kidney Institute, PLC,** a Domestic Professional LLC,<br>        Defendant. | Case No:<br><br>**Complaint** |

The Plaintiff, Nidia Chavez ("Plaintiff"), by and through undersigned counsel, alleges the following facts and claims against the Defendant, Southwest Kidney Institute, PLC, ("Defendant" or "SKI") and alleges the following:

## I.   NATURE OF THE CASE

1. Plaintiff seeks damages for interference with and deprivation of her rights under the Family Medical Leave Act 29 U.S.C. § 2601 *et seq.* ("FMLA").

2. Plaintiff seeks damages for denial of her rights under the Emergency Paid Sick Leave Act (EPSLA) and provisions of the Families First Coronavirus Response Protection Act, 29 USC 2601 *et seq.* ("FFCRA").

3. Plaintiff seeks damages for discrimination under the Americans with Disabilities Act and ADA Amendments Act, 42 U.S.C. Sections 12101, *et seq*. ("ADA").

4. Plaintiff seeks damages for violation of the Arizona Fair Wage and Healthy Families Act, A.R.S. § 23-371 *et. seq*. ("Paid Sick Leave Law").

5. Defendant retaliated against Plaintiff for having exercised her right to request and take paid sick time in violation of A.R.S. § 23-374(B).

## II.   PARTIES, JURISDICTION, AND VENUE

6. Plaintiff is a citizen of the United States of America, resident of Pima County, in the State of Arizona.
7. Defendant is an Arizona Professional LLC, registered with the Arizona Corporation Commission under Entity ID:P07964750.
8. Upon information and belief, the Defendant is an owner and operator of forty (40) renal care treatment centers in the State of Arizona. As a private-sector employer, Defendant has more than fifty (50) employees that work during twenty (20) or more workweeks.
9. This Court has subject matter jurisdiction of the FMLA, ADA, and FFCRA claims under 28 U.S.C. § 1331 & 29 U.S.C. § 2617(a); 28 U.S.C. § 1343(a); 42 U.S.C. § 1983.
10. This Court has supplemental jurisdiction of the State law claims pursuant to 28 U.S.C. § 1367.
11. Venue is proper in this District under 28 U.S.C. §1391 because all of the acts alleged herein occurred within the geographic region covered by this District of Arizona.
12. Plaintiff was an employee of Defendant within the meaning of 42 U.S.C. § 2000e(f) and 29 U.S.C. § 203(e)(1).
13. Plaintiff worked for Defendant for more twelve (12) months and exceeded the required 1,250 hours of service for the employer during the 12-month period immediately preceding her termination.
14. Plaintiff alleges that Defendant is legally responsible for the acts and/or omissions giving rise to this cause of action and is legally and proximately responsible for damages as alleged herein.
15. On June 23, 2020, Plaintiff filed an EEOC charge of discrimination.
16. On June 2, 2021, Plaintiff received the attached Notice of Right to Sue.

### III.     FACTUAL ALLEGATIONS

17. Plaintiff incorporate and realleges all aforementioned paragraphs as if fully set forth herein.
18. Plaintiff was employed by SKI, as a Surgical Technologist, for five (5), in Tucson, AZ.
19. Plaintiff is a biological mother of three (3) children and a stepmother to two (2) of her husband's children. The Plaintiff, her husband, and all five children received medical coverage from the Plaintiff's employer-based insurance policy.
20. As Defendant's only Surgical Technologist, in the Tucson area, Plaintiff was often called on to work at multiple SKI locations throughout the city.
21. Throughout her five (5) years of employment, the Plaintiff received only "Excellent" performance reviews. Throughout her tenure, Plaintiff was never admonished, reprimanding, or disciplined. Nor was Plaintiff ever written or warned for failure to follow the rules.
22. In March of 2020, in response to the Covid-19 pandemic, Defendant instituted health and safety protocols at all of its locations. The protocols were based on the "then available" knowledge of then novel corona virus. During the relevant period, the protocols required each employee to take his/her own temperature upon arrival, write it down on the provided form, and indicate whether they had a cough and/or fever.
23. At the time, a stuffy nose was not a widely known symptom of covid-19, and the employees were required to write it down along with their temperature, whether they had a fever and/or cough.
24. On Monday, June 8, 2020, Plaintiff arrived to work at 6:45am. Pursuant to the then in place, Covid-19 protocols, the Plaintiff took her own temperature, and circled "No cough" and "No fever" on the form.
25. At the end of her shift, while the Plaintiff walked to her car alongside her co-worker Monifa Yvonne, she noticed that she felt a little stuffy. However, she assumed it was allergies caused by the Big Horn Fire, which had been raging for three (3) days and was visible from her place of work.

26. The next morning, the Plaintiff arrived to work at 6:45am. Again, per protocol, the Plaintiff took her own temperature and completed the provided form.

27. At about 7:00am, Jennifer Kidd, the Plaintiff's immediate supervisor came in the door and said, "Moring Nidia how are you? How was your weekend?" The Plaintiff answered that she was doing well but indicated that her allergies were "killing" her and that she thought the fire was exasperating them. Kidd responded that her husband was also suffering from allergies due to the fire, given that he works outside.

28. The Plaintiff entered the breakroom, where her co-workers, Brenda De la Hoya, Monifa Yvonne, Jessica Serrto, and Noralee Martinez where sitting. She mentioned her allergies and asked the other employees if any of them where having allergies due to the fire.

29. Noralee, said" yes, I have the same symptoms as you." Brenda then stated, "you and Dr. El-Kass, are always having something wrong at the same time."

30. On Wednesday, June 10th, after she arrived at work, the Plaintiff again took her own temperature and indicated "No cough" and "No fever" on the form.

31. Later that day at lunch, the Plaintiff apologized in advance to her co-workers for eating with her mouth open, as the Sudafed she had taken had not cleared up her stuffiness. At that point, the Plaintiff did not have any other symptoms.

32. When one of the physicians, Dr. Tan asked her how she was doing, Plaintiff responded that she was fine "just a little stuffed up."

33. Thursday went by the same was. Plaintiff had no symptoms and followed the same protocols as the previous days.

34. Plaintiff was not scheduled to work on the following Friday, Saturday, or Sunday.

35. On the following Monday, June 15, 2020, Plaintiff still felt stuffy, and went to work she followed the same protocols as the previous week. She expressed to a co-worker Suzanne, that she did not feel good, but that she lacked a fever, cough, or any known Covid-19 symptoms. While the Plaintiff was in the Operation Room with Suzanne, Jennifer Kidd, her supervisor, came asked to speak to her about the autoclave machine.

36. Kidd expressed her dismay to the Plaintiff and Suzanne, that the managers at a SKI facility in Phoenix still permitted an employee to come in to work, despite the fact that

the employee's husband went to get tested due to possible Covid-19 exposure (and still had not received his test results).

37. Kidd asked the Plaintiff and Suzanne not to mention the matter, because she was not authorized to disclose it to them. At that point, the Plaintiff again told Kidd that she had been stuffy for nearly a week and did not feel well, but that she lacked a fever or cough.

38. Kidd told the Plaintiff to monitor her symptoms and to let her know if she needed anything.

39. Later that day, Dr. El-Kass came in for the first surgery and asked the Plaintiff "are you okay?" She informed him that she did not feel well and that she had been stuffy for a week. Brenda De la Hoya, Suzanne, and a patient were in the room and witnessed the conversation. Dr. El-Kass, continued with the surgery.

40. As the day went on, Plaintiff started feeling worse, and began to suspect that she might have contracted Covid-19. Plaintiff asked Suzanne to schedule an appointment for her to get tested. Suzanne made an appointment for her at CVS.

41. Plaintiff assisted in several surgeries that day. At the end of the day, Jennifer Kidd called Plaintiff into her office and told her that she needed to go get tested. Kidd admitted that she should have sent Plaintiff home in the morning, as soon as Plaintiff informed her that she was feeling strange.

42. When the Defendant instituted its safety provisions in response to Covid-19, it informed all of its employees that any employee who contracts Covid-19 would receive two weeks of paid Covid-19 emergency leave, pursuant to the FFCRA. Employers who provide paid sick leave for COVID-19 related reasons may receive tax credits under the FFCRA and the American Rescue Plan Act of 2021 (ARP) H. R. 1319 Pub L. No. 117-2.

43. That afternoon (June 15, 2020), Plaintiff took a Covid-19 test on. She received the results two days later, and immediately informed her supervisor, Jennifer Kidd. Plaintiff was told to stay home for the next two (2) weeks, and that she would receive two weeks of Covid-19 emergency pay, pursuant to the FFCRA.

44. On Monday the June 22nd, Plaintiff received a phone call from administrators at SKI. On the call was Jennifer Kidd (her immediate Supervisor), the District Manager, David Berry, and the HR Manager Oscar.

45. During the call, SKI management terminated the Plaintiff. The stated reason was her alleged failure to follow safety protocols, by not informing management of her symptoms.

46. The Plaintiff informed the District Manager that, beginning June 8, 2020, she had informed her immediate supervisor (Kidd), on multiple occasions, that she was feeling stuffy, and that she believed it was allergies. During the call, SKI management terminated the Plaintiff. The stated reason was her alleged failure to follow safety protocols, by not informing management of her symptoms.

47. Kidd denied any prior knowledge of the Plaintiff's symptoms and denied having any of the conversations referenced above.

## IV.  ALLEGATIONS, THE EMPLOYEE'S RIGHTS UNDER FEDERAL & STATE LAW.

48.  Plaintiffs incorporate and reallege all aforementioned paragraphs as if fully set forth herein.

49. The Family Medical Leave Act 29 U.S.C. § 2601 *et seq.* ("FMLA"), applies to certain employers, and provides covered employees with protections relating to medical leave and time off.

50. The FMLA provides employees with, up to 12 workweeks (in a 12-month period) of unpaid leave for qualifying medical reasons. The FMLA further provides that upon return from FMLA leave, the employee is entitled to return to work and resume the same, or nearly identical (equivalent) position and pay and he/she had prior to taking leave.

51. Among other things, the FFCRA expanded the FMLA and introduced three (3) new relevant provisions:

   a. Division C—Emergency Family and Medical Leave Expansion Act;
   b. Division D—Emergency Unemployment Insurance Stabilization and Access Act Of 2020;

c. Division E—Emergency Paid Sick Leave Act.

52. Pursuant to the new provisions, employees are entitled to fourteen (14) days of **paid** sick leave, **in addition** to the standard unpaid leave under the original FMLA. See 29 USC 2601, §5102. ("FFCRA"). See *Division C of FFCRA* titled "Emergency Family and Medical Leave Expansion Act."

53. The original FMLA, an employee is only entitled to unpaid leave, and permits an employer to require that the employee to use accrued paid vacation leave, paid sick or family leave for some or all of the FMLA leave period.

54. On the other hand, the FFCRA requires that paid COVID leave be used before any other leave program is exhausted. Moreover, employers are prohibited from diminishing rights under an existing policy, by requiring employees to first use existing/accrued sick leave programs. See FFCRA § 5102

55. The Americans with Disabilities Act and ADA Amendments Act, 42 U.S.C. Sections 12101, *et seq*. ("ADA") prohibits discrimination against people with disabilities in several areas, including employment. The act protects employees from discrimination based on a disability.

56. The ADA does not specifically name all of the impairments that are covered. However, the Act defines "*disability*" as, a physical or mental impairment that substantially limits one or more major life activities of such individual. See 42 U.S.C. 126 §12102(1). The definition covers persons who have a record of such an impairment, even if they do not currently have a disability.

57. The ADA defines *"Major Life Activities"* to include, the ability to care for oneself, perform manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. *Id*. at §12102(2).

58. The rules of construction for the ADA require that the definition of "disability" "be construed in favor of broad coverage of individuals . . . to the maximum extent permitted

by the terms of [the ADA]."[1] To be a person with a "disability" under the ADA, "an individual is only required to satisfy one prong."[2]

59. The Arizona Fair Wage and Healthy Families Act, A.R.S. § 23-371 *et. seq*. ("Paid Sick Leave Law"). Under the act, "earned paid sick time" shall be provided upon the request of an employee. § 23-374(B). The Act further prohibits an employer from retaliating or discriminating against an employee or former employee because the person has exercised rights protected under this article. Moreover, the AZ Act, like the 29 USC 2601, §5102, makes it unlawful for an employer's absence control policy to count earned paid sick time taken under this article as an absence that may lead to or result in discipline, discharge, demotion, suspension, or any other adverse action. § 23-374(C).

**COUNT 1: DENIAL OF RIGHTS UNDER FMLA 29 U.S.C. § 2601 *et seq*. & FFCRA, 29 USC 2601 *et seq*.**

60. Plaintiff incorporate and realleges all aforementioned paragraphs as if fully set forth herein.

61. When the Plaintiff received her final paycheck, post-termination, she learned that it did not include paid sick leave as provided under the FFCRA § 5102. Rather, the plaintiff's final check included payment from her accrued paid time off ("PTO").

62. The Defendant deprived the Plaintiff her right to emergency paid sick leave under FFCRA § 5102 by paying her final paycheck using accrued sick leave and not paying her the required leave.

**COUNT 2: BREACH OF CONTRACT**

63. Plaintiff incorporate and realleges all aforementioned paragraphs as if fully set forth herein.

64. When the Defendant instituted its safety provisions in response to Covid-19, promised all employees that, any employee who contracts Covid-19 would receive two weeks of paid

---

[1] See 29 C.F.R. pt. 1630, app. § 1630.2(g); 42 U.S.C. § 12102(4)(A).
[2] 29 C.F.R. pt. 1630, app. § 1630.2(g)(2).

Covid-19 emergency leave, pursuant to the FFCRA. The employer applied for and received tax credits for providing leave, under the FFCRA and the American Rescue Plan Act of 2021 (ARP) H. R. 1319 Pub L. No. 117-2.

65. The Defendant's promise of paid leave were consideration to induce its (HSA) employees to continue to show up for work, despite the dangers posed to them due to the Covid-19 pandemic.

66. By continuing to show up to work, the Plaintiff fulfilled her duties under the agreement.

67. The Defendant failed to honor those promises and pretextually terminated the Plaintiff.

**COUNT 3: MISAPPROPRIATION UNDER EPSLA.**

68. Plaintiff incorporate and realleges all aforementioned paragraphs as if fully set forth herein.

69. The Defendant misappropriated the Plaintiff's previously accrued paid leave, and used it to fraudulently satisfy its obligation under the FFCRA, in direct violation of the law. § 5102. The FFCRA makes it clear that paid time off is in addition to and supplemental to the employee's rights under an existing policy. *Id.*

**COUNT 4: DEPRIVATION OF RIGHTS UNDER THE FMLA AND RETALIATION.**

70. Plaintiff incorporate and realleges all aforementioned paragraphs as if fully set forth herein.

71. Plaintiff seeks damages for interference with and deprivation of her rights under the Family Medical Leave Act 29 U.S.C. § 2601 *et seq.* ("FMLA").

72. Under the FMLA, the Plaintiff was entitled to take unpaid sick leave for qualifying medical reasons. Further, upon her to return from FMLA leave, the Plaintiff is permitted to job restoration, in the same job position and pay.

73. Under the FMLA's anti-retaliation provision prohibits the employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights. 29 C.F.R. § 825.220(c). It is unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right of the FMLA. 29 U.S.C. § 2615(a).

74. Three (3) days after the Plaintiff exercised her rights under the FMLA, her employer terminated her in retaliation for exercising those right.
75. As provided under the FMLA, Plaintiff is entitled to collect liquidated damages equal to the sum of her lost compensation, wages, and benefits.
76. As a result of Defendant's violation of the FMLA, Plaintiff is entitled to collect wages, employment, and pension benefits denied or lost, interest on this amount, liquidated damages equal to the lost compensation, wages, benefits, including her backpay damages, compensatory damages, and her reasonable attorneys' fees and costs. Plaintiff is also entitled to reinstatement or in lieu thereof front pay and other appropriate equitable relief, as well as all other remedies available under 29 U.S.C. § 2601, et seq.

**COUNT 5: DEPRIVATION OF RIGHTS UNDER THE ARIZONA FAIR WAGE AND HEALTHY FAMILIES ACT, A.R.S. § 23-371 et. seq, AND RETALIATION.**

77. Plaintiff incorporate and realleges all aforementioned paragraphs as if fully set forth herein.
78. Arizona Fair Wage and Healthy Families Act prohibits an employer from interfering with, restraining, or deny the exercise of, or the attempt to exercise, any right protected under the act. A.R.S. § 23-374.
79. The act further prohibits retaliation or discrimination against an employee or former employee for exercising such rights. *Id.*
80. When the Plaintiff exercised her rights under the act, the Defendant retaliated by terminating her for using her earned paid sick time. § 23-374(C).
81. The Defendant further violated the Plaintiff's rights by using her "earned paid sick time" without receiving a request to do so from the Plaintiff. § 23-374(B).
82. The Plaintiff is entitled to collect liquidated damages equal to the sum of her lost compensation, wages, and benefits.
83. The Plaintiff is entitled to collect damages for retaliation under the act.

**COUNT 6: DISCRIMINATION UNDER THE ADA 42 U.S.C. 12101, *et seq*.**

84. Plaintiff incorporate and realleges all aforementioned paragraphs as if fully set forth herein.

85. The ADA prohibits discrimination against a qualified individual with a disability in regard to terms, conditions and privileges of employment. 42 U.S.C. Sec. 12112(a).

86. The ADA defines "disability" as, a physical or mental impairment that substantially limits one or more major life activities of such individual. See 42 U.S.C. 126 §12102(1). The definition covers persons who have a record of such an impairment, even if they do not currently have a disability.

87. When she contracted Covid-19, the Plaintiff was suffered impairments that substantially limits a major life activity, as such she suffered from a disability as defined by the ADA.

88. The Defendant is an employer under the ADA.

89. Defendant knew of Plaintiffs disability and terminated her because of it. The ADA does not cover impairments that are transitory and minor. §12102(3)(B). However, the lasting effects of Covid-19 are unknown.[3] However, the effects of COVID-19 meet at least one of several of the types of physical impairments under the ADA, which the EEOC regulations provide includes "any physiological disorder … affecting one or more body systems, such as special sense organs, respiratory … cardio vascular, digestive … immune, circulatory, hemic and lymphatic … and endocrine." 29 C.F.R. § 1630.2(J)(3). COVID-19's impact effects one or several major life activities, such as the operation of a major bodily functions, like immune cell growth, neurological, bowel, respiratory and endocrine function.42 U.S.C. 12101(2)(B).

90. The Plaintiff is entitled to collect damages for her termination and discrimination in violation of the ADA.

---

[3] A Brief Summary of The Long-Term Effects. https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html . See also Centers for Disease Control and Prevention. 2021. *Post-COVID Conditions: Information for Healthcare Providers*. [online] Available at: https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/post-covid-conditions.html [Accessed 15 August 2021].

**COUNT 7:  NEGLIGENT DISCLOSURE OF MEDICAL RECORDS AND NEGLIGENCE PER SE.**

91. Plaintiff incorporate and realleges all aforementioned paragraphs as if fully set forth herein.
92. The Defendant had a duty to protect the medical records of its employees.
93. The Defendant is a health care provider within under HIPAA. Moreover, it is a covered employer under HIPPA.
94. The Defendant breached its duty when it negligently disclosed to multiple staff members at the Plaintiff's branch, that the Plaintiff was diagnosed with Covid-19.
95. While HIPPA does not provide a private right of action for wrongful disclosure, Arizona law provides a cause of action for Negligent disclosure.
96. Violation of the HIPAA standards is negligence per se.
97. The Plaintiff is entitled to collect for the damages she suffered.

**COUNT 8:  LOST WAGES RESULTING FROM THE WRONGFUL TERMINATION AND VIOLATION OF THE PROCEEDING RIGHTS.**

98. Plaintiff incorporate and realleges all aforementioned paragraphs as if fully set forth herein.
99. The Plaintiff was employed by SKI, as a Surgical Technologist, for five (5), in Tucson, AZ.
100. Plaintiff is a biological mother of three (3) children and a stepmother to two (2) of her husband's children. The Plaintiff, her husband, and all five children received medical coverage from the Plaintiff's employer-based insurance policy.
101. When the Plaintiff was terminated, she, along with her husband, and minor children were deprived of medical insurance.
102. The Plaintiff was deprived of her income and did not find another job for five (5) months.
103. The Plaintiff is entitled to collect damages for her lost wages and benefits.

**PUNITIVE DAMAGES**

1. The Defendants engaged in conduct, acts, and omissions to serve their own interest and pursued a course of conduct having reason to know of, yet consciously disregarding substantial risk that such conduct might significantly injure the rights of Plaintiff.
2. The willful and intentional acts, as set forth in this complaint are of such an aggravated or outrageous nature to indicate motive by an evil mind, coupled with an evil hand.
3. Therefore, a punitive damages award against defendant in an amount to be proven at trial is fully justified and warranted and would have the effect of deterring others from committing similar acts and omissions.

WHEREFORE Plaintiffs pray for judgment against the Defendants as follows:

   A. For actual damages,
   B. For other special damages,
   C. For punitive damages in the amount and to the extent allowed by law.
   D. For taxable costs and pre- and post-judgment interest to the extent permitted by law.
   E. For damages related to claims under federal law.
   F. Psychological damages, emotional damages.
   G. Reputation damages.
   H. For reasonable attorneys' fees and costs.
   I. For such other relief as the Court deems just and proper.

Respectfully submitted this August 31, 2021

| **SHAW LAW, P.L.L.C.** | **TEKBALI LAW, P.L.L.C.** |
|---|---|
| **By:** /S/ Jill Kappus Shaw, Esq. | **By:** /S/ Salam A. Tekbali |
| **Jill Kappus Shaw,** | **Salam A. Tekbali** |

|  |  |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | I hereby certify that on the date stated above, a copy of the foregoing has been transmitted electronically to the CM/ECF filing system for filing and transmittal along with copies transmitted to the following parties via the CM/ECF system. |

**Southwest Kidney Institute, PLC**

1845 W Orange Grove Rd #111
Tucson, AZ 85704, USA

and

**Southwest Kidney Institute, PLC**

337 E CORONADO RD STE 201,
PHOENIX, AZ, 85004

C/o

**MH SERVICE LLC**

201 E Washington Street Ste 800,
Phoenix, AZ 85018